**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| **DARLENE HILL; DARLENE HILL d/b/a CLEMENT HILL FURNITURE,** | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| **v.** | ) ) | Civil Action Number **3:10-cv-1017-AKK** |
| **AUTO-OWNERS INSURANCE COMPANY,** | ) ) ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Darlene Hill and Darlene Hill d/b/a Clement Hill Furniture

(collectively "Plaintiffs") filed this action against their insurance carrier Auto-

Owners Insurance ("Defendant") in the Circuit Court of Colbert County, Alabama

alleging claims for breach of contract, bad faith, fraud, misrepresentation, and

deceit.  Doc. 1-1; doc. 9 at 1-2.  Defendant timely removed the action to this court

and now moves for summary judgment on all of Plaintiffs' claims except for the

breach of contract claim.[1]  The motion is fully briefed, (docs. 28, 31), and ripe for

adjudication.  For the reasons stated below, the motion is GRANTED.

---

[1] This opinion addresses the bad faith claim only because Plaintiffs concede their fraud, misrepresentation, and deceit claims.  Doc. 28 at 30.

# I. <u>SUMMARY JUDGMENT STANDARD OF REVIEW</u>

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Id*.  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir.

2

2005) (*per curiam*) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560,1563 (11th Cir. 1989)).

## II. FACTUAL BACKGROUND

Darlene Hill ("Hill") and her husband, Steve Hill,[2] owned and operated Clement Hill Furniture ("the furniture store"), which Defendant insured for property, liability, and accounts receivable coverage.  Doc. 27-1 at 2-6.  This action arises from Defendant's rejection of a claim Plaintiffs submitted, totaling $641, 915.00, for a "fire, assume it to be electrical," that severely damaged the furniture store.  Doc. 29-2; doc. 27-25 at 41.

On October 22, 2009, after Hill finished teaching a piano lesson around 6:30 - 6:40 p.m., she spoke with her student, locked the furniture store, and then headed home, a 20-30 minute drive with her husband.[3]  Doc. 27-16 at 14-15 (dep. p. 50, 54).  At approximately 7:45 p.m., a Hardee's employee saw smoke coming from the furniture store.  Doc. 27-12 at 5.  Another Hardee's employee ran around the

---

[2] Steve Hill is not a party in this action.  Doc. 25 at 2.

[3] Only Hill, her husband, and her son had keys to the furniture store.  Doc. 25 at 6; doc. 27-12 at 4.  Hill stated in a recorded interview she gave Defendant, in support of her claim, that she spoke with her student for ten minutes, but, later, in her deposition in this case, she stated that the conversation lasted 30-40 minutes.  Doc 27-5 at 8; doc. 27-16 at 14 (dep. p. 51).  Also, Hill stated in her recorded interview that her husband drove home that day, but that she could do the drive in 20 minutes.  Doc. 27-5 at 9.  Steve Hill testified in his deposition that they lived 30 minutes away from the furniture store.  Doc. 27-17 at 21 (dep. p. 79).

perimeter of the furniture store, saw no one around, and noticed that all the doors were locked. *Id.* Hardee's manager, Kelsey Sledge, called the fire department at 8:00 p.m. *Id;* doc. 27-18 at 2. Shortly thereafter, before Hill arrived home, her cousin, who has a police scanner, called to tell her about the fire. Doc. 27-16 at 15 (dep. p. 55); doc. 27-12 at 4; doc. 27-7 at 2. After driving home first, Hill and her husband returned to the furniture store and watched the fire department's unsuccessful attempts to save it from destruction.

Deputy State Fire Marshall Jimmy Collier, along with the United States Department of Justice, and the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), investigated the fire, (doc. 27-26 at 2-3), and could not determine the cause.[4] Doc. 27-25 at 65 (dep. p. 64). Hill notified Defendant the next day, doc. 27-4 at 2, and Defendant retained Southeastern Origin and Cause ("SO&C") and Unified Investigations & Sciences, Inc. ("UI&S") to investigate and determine the cause. Doc. 31-4 at 2; doc. 27-26 at 2-3. SO&C investigator, Darwin Clark ("Clark"), concluded that the nature of the fire was incendiary, rather than accidental, because burn pattern analysis and other information gathered showed multiple origins for the fire. Doc. 27-12 at 7. Moreover, UI&S electrical

---

[4] Defendant's claim supervisor, Greg Underwood ("Underwood"), testified that since the district attorney did not pursue an arson claim against Hill, Fire Marshall Collier's report concluded that the cause of the fire was undetermined. Doc. 27-25 at 64-65 (dep. p. 63-64).

engineer, Tony Bishop ("Bishop"), whose findings SO&C reviewed and incorporated into its report, eliminated the electrical system as a cause. Doc. 32-1 at 2.

As part of the claim investigation, Defendant obtained Hill's personal and business financial information. Doc. 25 at 7. The records revealed that Darlene Hill d/b/a Clement Hill Furniture owed $9,000 in unpaid sales taxes, (doc. 27-16 at 6, dep. p. 17; doc. 27-22), $9,000 to Hulett Wholesale, (doc. 27-16 at 5, dep. p. 16), and $16,000 to Ashley Furniture, (*id.*, dep. p. 15; doc. 27-21). In addition, the local utilities previously discontinued gas and trash services at the furniture store, (doc. 27-5 at 26; doc. 27-16 at 6, dep. p. 18), and the store was slated for a foreclosure sale approximately two weeks after the fire, (doc. 27-16 at 7, dep. p. 22; doc. 27-19). Also, Hill personally owed approximately $2,900 to the gas company, (doc. 27-16 at 6, dep. p. 19), $100,000 on credit cards, (doc. 27-5 at 21), and $12,000 to her brother, (doc. 27-5 at 22).

Based on the investigation, Defendant's field claims adjuster, Stuart Trubey ("Trubey"), recommended denying Plaintiffs' claim. Doc. 29-2 at 23. Thereafter, Underwood and two colleagues, John Block and Diane Weaver, reviewed the investigation findings and unanimously agreed with Trubey. Doc. 27-25 at 32

(dep. p. 31).  Defendant notified Hill of the decision to deny the claim by letter dated February 3, 2010.  Doc. 29-2 at 1-4.

Approximately one month after Defendant denied their claim, Plaintiffs filed suit and retained experts to investigate the cause of the fire.  Doc. 1-1 at 4; doc. 29-4.  Fire investigator William R. Bush pegged electrical arcing as the cause, doc. 29-4 at 22, 25, and John K. Owens, professor emeritus, in the electrical engineering and aerospace engineering departments at Mississippi State University, concluded that he could not eliminate an electrical issue as the cause. *Id.* at 1, 6.  Bush and Owens issued their reports on April 14 and April 15, 2011, respectively, approximately fourteen months after Defendant rejected Plaintiffs' claim.  *Id.* at 2, 23.

## III.  ANALYSIS

The Alabama Supreme Court first recognized bad faith in first party insurance actions in *Chavers v. National Security Fire & Casualty Co.*, 405 So. 2d 1 (Ala. 1981) (*per curiam*), based on the rationale that "[e]very contract carries with it an implied in law duty of good faith and fair dealing."  405 So. 2d at 6 (citation omitted).  Therefore, the Court held that an actionable tort for bad faith arises where there is either (1) no lawful basis for the refusal of a claim coupled with actual knowledge of that fact, or (2) intentional failure to determine whether

there was any lawful basis for the refusal.  *Id.* at 7 (citation and quotation marks omitted).

Alabama recognizes two types of bad faith, ordinary and extraordinary, in the insurance context.  *See Thomas v. Principal Fin. Group*, 566 So. 2d 735, 740 - 45 (Ala. 1990).  Ordinary bad faith occurs when an insurer has no legitimate or arguable reason to deny a claim and knows that it has no such reason.  *See Nat'l Sec. Fire & Cas. Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982) (citation omitted).  Extraordinary bad faith occurs when an insurer intentionally or recklessly fails to investigate a claim or to subject the results of its investigation to a cognitive evaluation or review.   *See Acceptance Ins. Co. v. Brown*, 832 So. 2d 1, 16 (Ala. 2001) (citations omitted).

Plaintiffs assert both ordinary and extraordinary bad faith in this case and, essentially, support both by claiming that Defendant failed to properly investigate their claim and to subject its findings to a cognitive evaluation or review.  Doc. 28 at 29.  The court will address the ordinary bad faith claim first in subsection A, and then the extraordinary contention in subsection B.  For the reasons stated below, the court finds that Plaintiffs failed to establish either of their bad faith claims.

**A.      Plaintiffs fail to establish a *prima facie* case of ordinary bad faith.**

Plaintiffs' ordinary bad faith claim is premised on their contention that

Defendant failed to properly investigate their claim.[5]  Doc. 1-1 at ¶ 4.  To prove

that an insurer refused to pay a claim in bad faith, the insured must establish:

(a)      an insurance contract between the parties and a breach thereof
by the defendant;

(b)      an intentional refusal to pay the insured's claim;

(c)      the absence of any reasonably legitimate or arguable reason for
that refusal (the absence of a debatable reason[6]);

(d)      the insurer's actual knowledge of the absence of any legitimate
or arguable reason; and

(e)      if the intentional failure to determine the existence of a lawful
basis is relied upon, the insured must prove the insurer's
intentional failure to determine whether there is a legitimate or
arguable reason to refuse to pay the claim.

*Bowen*, 417 So. 2d at 183.  Moreover, as part of establishing a *prima facie* case,

"the proof offered must show that the [insured] is entitled to a directed verdict on

the contract claim and, thus, entitled to recover on the contract claim as a matter of

law."  *Nat'l Sav. Life Ins. Co. v. Dutton*, 419 So. 2d 1357, 1362 (Ala. 1982).

---

[5]Plaintiffs argue also that Defendant failed to properly subject its investigation results to
a cognitive review.  Doc. 28 at 29.  However, this argument relates only to extraordinary bad
faith, *see Brown*, 832 So. 2d at 16, and is therefore addressed in section B.  For the same reasons
stated therein, this argument fails also to carry the day on Plaintiffs' ordinary bad faith claim.

[6] A debatable reason is an arguable reason, in fact or in law, that is open to dispute or
question.  *See Bowen*, 417 So. 2d at 183; *Gulf Atl. Life Ins. Co. v. Barnes*, 405 So. 2d 916, 924
(Ala. 1981).

Significantly, "[i]f [the insured's] evidence fails to eliminate *any* arguable reason for denying payment, *any* fairly debatable reason on a matter of fact or a matter of law, [the insured] cannot recover under the tort of 'bad faith refusal.'" *Bowen*, 417 So. 2d at 185 (emphasis added). The insured's burden is heavy. *See Dutton*, 419 So. 2d at 1362. To succeed, essentially, she must eliminate each of the insurer's "arguable" reasons for denying the claim.

Defendant contends that Plaintiffs cannot establish a *prima facie* case because it had three "arguable" reasons for denying the claim: (1) the fire had an incendiary nature; (2) Hill had the motive to commit arson; and (3) Hill had the opportunity to commit arson or procure someone to do so. Doc. 25 at 16. Plaintiffs counter that Defendant failed to (1) rule out an electrical cause for the fire, (2) consider the legitimate reasons for the presence of flammable mineral spirits at the furniture store, or (3) submit its investigation results to a cognitive review. Doc. 28 at 17-20. The court turns now to the parties' contentions.

1.   *Incendiary nature of the fire*

First, Defendant asserts that it rejected the claim because its electrical and fire-scene investigations indicated arson as a cause. Doc. 25 at 19. Plaintiffs attack this finding by claiming that Defendant has no proof that it actually conducted an electrical investigation because Defendant failed to submit any

evidence, including a report or an invoice from an electrical expert, to prove that it conducted an electrical investigation.  Doc. 28 at 20-21.  To counter Plaintiffs' contention, in its reply, Defendant submitted UI&S's certified electrical engineering report, proof of payment to UI&S for the electrical investigation, and supporting affidavits.[7]  Doc. 31-1.  Based on this court's review, the engineering report shows that UI&S's Bishop examined the furniture store's electrical facilities, underground electrical service, breakers, circuits, and items collected and bagged by the ATF, that Bishop concluded that the fire caused the electrical activity he observed, and ruled out the failure of the electrical system as a cause of the fire.  Docs. 31-1 at 7-13 and 32-1 at 2.  Further, SO&C investigator, John Evers ("Evers"), stated in his affidavit that SO&C reviewed and incorporated Bishop's electrical findings in its report.  Doc. 31-1 at 2-3.  Finally, the evidence shows also that Defendant hired UI&S, sent its claims adjuster, Trubey, to the fire scene during Bishop's inspection, that Bishop showed Trubey portions of the electrical system, and expressed his opinion to Trubey that the fire was not caused by an electrical system.  Doc. 31-4 at 2-3.  In short, Trubey's and Evers's affidavits and

---

[7] Although evidence must be served with the motion, Fed. R. Civ. P. 6(c)(2), the court will consider documents or additional evidence submitted specifically for the purpose of replying to an issue raised in the response.  *See Tishcon Corp. v. Soundview Comm. Inc.,* No. 1:04-CV-524-JEC, 2005 WL 6038743, at *8 (N.D. Ga. Feb. 15, 2005).  Thus, Defendant's evidence, which it claims it produced to Plaintiffs in discovery, docs. 31 at 10 and 31-2, and which Plaintiffs did not challenge, is submitted to rebut Plaintiffs' contentions and is a part of the record.

Bishop's report, which Plaintiffs never rebutted in a sur-reply, belie Plaintiffs'
contention that Defendant failed to conduct an electrical examination.  Moreover,
Bishop's findings support Defendant's contention that it had an "arguable" basis
for eliminating the electrical system as a cause for the fire.

Plaintiffs contend also that Defendant failed to consider legitimate reasons
for the presence of flammable mineral spirits at the furniture store.  Doc. 28 at
23-25.  Specifically, Plaintiffs argue that its former employee, Jamie Hall ("Hall"),
"clearly explained" that Plaintiffs kept mineral spirits at the furniture store during
the five years he worked for Plaintiffs.  Doc. 28 at 29.  Hall's testimony, however,
does not support Plaintiffs' contentions that it had a legitimate purpose for storing
the mineral spirits.  In fact, Hall suggested otherwise.  When Defendant asked Hall
about the products he used on furniture, he stated, "[w]e didn't do no re-covering
or re-staining of the furniture."  Doc. 27-8 at 3.[8]  When asked what process, if any,
the furniture store used on the occasions when it needed to stain or refinish
furniture, Hall answered, "[w]e did not touch it . . . [a]t the time I was helping
[Steve], we didn't do no staining or stripping of furniture."  *Id.*  Needless to say,
Hall's testimony does not provide a clear explanation that Plaintiffs had legitimate
reasons for storing mineral spirits.  In light of Hall's overall testimony, Plaintiffs'

---

[8] Interview with Jamie Hall, Hill's former employee, in Spruce Pine, Ala.  (Nov. 13,
2009).

contention that Defendant failed to consider Hall's interview that purportedly provided a legitimate reason for the presence of flammable mineral spirits at the furniture store rings hollow.

To further attack Defendant's arson determination, Plaintiffs contend next that SO&C investigator Clark unjustifiably relied on positive samples of mineral spirits in concluding that the arsonist used an ignitable fluid to spread the fire. Doc. 28 at 23-25. Specifically, Plaintiffs argue that the four samples Clark obtained from the fire debris tested positive for mineral spirits because they came from the area near where Plaintiffs stored the mineral spirits. *Id.* at 17, 23. In making this assertion, however, Plaintiffs overlook the specific results of SO&C's laboratory analysis, which detected the presence of an ignitable liquid in four places: "*floor* of the storage room . . . *floor* of the electrical room hallway . . . storage room *floor* off electrical hallway . . . and *sectional couch* on showroom floor." Doc. 27-12 at 6 (emphasis added). Moreover, Plaintiffs offer no evidence to show that they had legitimate reasons for the presence of mineral spirits on the sectional couch. Furthermore, Plaintiffs overlook that Clark found multiple origins of the fire and, based on burn pattern analysis, concluded that the arsonist may have used an ignitable fluid to spread the fire. *Id.* at 7. In other words, the

evidentiary record undermines Plaintiffs' contention that Clark relied unjustifiably on the positive samples in finding that the nature of the fire was incendiary.

Here, Defendant supported its arson finding by relying on an engineering report that ruled out an electrical cause, the multiple origins of the fire, burn pattern analysis, and the presence of flammable mineral spirits.  To prevail on the bad faith claim, Defendant does not have to establish conclusively that the fire was intentional.  Rather, it simply has to show that it had an "arguable" reason for its determination.  Based on the record before this court, Defendant has satisfied its burden.

> 2.   *Financial motive*

Second, Defendant asserts that Plaintiffs "had a strong financial motive to set the fire."  Doc. 25 at 16.  In support, it presented evidence that Hill's personal and business financial information revealed that she was in dire straits,[9] and faced a foreclosure sale on November 3, 2009 - i.e., two weeks after the fire.  *Id.* at 8; doc. 27-19 at 2.  While Hill contends that Defendant cannot use the pending foreclosure sale as evidence of motive because she purportedly did not know about it,[10] she testified to the contrary in her deposition:  "Q. Now, you understood that

---

[9] Defendant asserts also that "[t]he building was for sale and advertised as a 'retirement sale'" and that "Darlene Hill had gone so far as to request help from the President of the United States, Senator Richard Shelby and the Governor of Alabama."  Doc. 25 at 17.

[10] The Post Office returned the certified notice of the foreclosure sale to the bank unsigned and unopened.  Doc. 28 at 17.

the building was set for foreclosure sale?  A. I did, but I wasn't going to accept that
. . .we had already talked [ ] about auctioning it off, so we wasn't going to let it
reach foreclosure."  Doc. 27-16 at 7 (dep. p. 22).  Later, Defendant specifically
asked Hill, "Did you understand the foreclosure was set sometime in early
November?  A. I did."  *Id.*  Hill's testimony reveals that she, in fact, knew about
the scheduled foreclosure sale before the fire.  Moreover, Plaintiffs offered no
evidence to rebut the dire picture Defendant uncovered about their finances.  In
other words, Plaintiffs failed to rebut Defendant's contention that it had an
"arguable" reason to believe that Hill had a financial motive to set the fire.

  3. *Opportunity to set the fire*

  Third, Defendant contends that Hill had sufficient opportunity to set the fire
between the time she left the store and the 911 call.  Doc. 25 at 18.  Hill stated
during her claim interview that she "[h]ad [the piano student] from 6-6:30 . . . [w]e
probably talked like 10 minutes or so . . .," doc. 27-5 at 8, and that she and her
husband left the store at approximately "10 to 7 or probably 7, somewhere like
that," *id*. at 9.  Since her husband drove, it should have taken them thirty minutes to
get home.  Doc. 27-17 at 21 (dep. p. 79).  Yet, incredibly, although they
purportedly made no stops[11], when asked how far from home she was when she

---

[11] When asked if she made any stops on her way home so as to account for the gaps in
time, Hill answered, "No."  Doc. 27-16 at 15 (dep. p. 54).

received her cousin's call, Hill answered, "[h]alf a mile. . . ." Doc. 27-16 at 16
(dep. p. 58). In other words, even though they should have made it home by 7:20
or 7:30 p.m., the Hills were still a few minutes away from home when they
received the call shortly after 8:00 p.m.

Perhaps, in light of the obvious discrepancy, Hill changed the time line in
her testimony in this case. Specifically, in her deposition, she provided a different
time line: "Q. So you think this piano lesson ended about 6:30 or 6:40, somewhere
in there? A. Yes. Q. About how long do you think this conversation [with your
piano student] went on? A. Probably about 30 minutes, 30 to 40 minutes." Doc.
27-16 at 14 (dep. p. 50-51). Again, the Hills live 20-30 minutes away from the
furniture store. Whether they left the furniture store at 6:50 or 7 p.m., as Hill said
in her interview with Defendant, or 7:20 p.m., as she testified in her deposition, she
offers no evidence to account for her whereabouts given the short distance between
her house and the furniture store. In fact, since the Hills lived 20-30 minutes away,
even a departure time of 7:20 p.m., as she now contends, would have meant they
arrived home *before* the 911 call at 8:00 p.m., instead of purportedly still being half
a mile away.

Significantly, Plaintiffs offer no evidence  to eliminate the discrepancy
between Hill's first interview, which occurred shortly after the fire, and her

deposition testimony.  Instead, Plaintiffs state only that the gap in time "does not

support any inference that Plaintiffs caused this fire" and that Defendant cannot use

it as evidence of opportunity.  Doc. 28 at 10.  However, without more from

Plaintiffs, the evidence supports Defendant's contention that it had an "arguable"

reason to believe that Hill had the opportunity to set the fire or procure someone

else to do so.  Indeed, based on the evidence Defendant <u>had</u> when it decided to

deny the claim, i.e., not including the revised time line Hill provided in this case,

she and her husband left the furniture store at 6:50 or 7:00 p.m. and should have

made it home by 7:30 p.m. at the latest.  Doc. 27-5 at 9; doc. 27-17 at 21 (dep. p.

79).  Yet, Hill informed Defendant during her claim interview that they were half a

mile away from home when her cousin called to tell her about the fire around 8:00

p.m.  This thirty minute discrepancy that Hill failed to explain is sufficient for

Defendant to establish that it had an arguable reason to believe she had an

opportunity to set the fire.  *See Dutton*, 419 So. 2d at 1262 (validity of a claim

denial judged by information then available to insurer).

In addition, Defendant asserts that its three "arguable" reasons satisfy a

*prima facie* showing of arson, which, in effect, raises an inference that the insured

committed arson and enables the insurer to withstand a motion for directed verdict.

Doc. 25 at 19; *see also Hillery v. Allstate Indem. Co.*, 705 F. Supp. 2d 1343, 1361

(S.D. Ala. 2010).  "[I]n order for a plaintiff to make out a *prima facie* case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law."  *Dutton*, 419 So. 2d at 1362.  The *Dutton* test is "intended as an objective standard by which to measure plaintiff's compliance with his burden of proving that defendant's denial of payment was without any reasonable basis either in fact or law."  *Safeco Ins. Co. of Amer. v. Sims*, 435 So. 2d 1219, 1224 (Ala. 1983).  As discussed earlier, because Defendant established a *prima facie* showing of arson for the purposes of denying Plaintiffs' claim, i.e., "arson by someone, motive by the plaintiff and unexplained surrounding circumstantial evidence implicating the plaintiff," *Great Southwest Fire Ins. Co. v. Stone*, 402 So. 2d 899, 900 (Ala. 1981), Plaintiffs fail the *Dutton* test because they cannot show Defendant's denial of their claim was void of any reasonable basis.  Since Plaintiffs' evidence fails to eliminate any of Defendant's three "arguable" reasons for rejecting their claim, Plaintiffs cannot meet their burden for a directed verdict.  Consequently, their claim for ordinary bad faith necessarily fails.[12]

---

[12] Defendant's *prima facie* showing of arson allows them to present that defense at trial. *Hillery*, 705 F. Supp. 2d at 1361.

**B.      The facts do not support a finding of "extraordinary" bad faith**.

Plaintiffs argue alternatively that Defendant exercised "extraordinary" bad faith when it denied their claim by purportedly failing to properly investigate their claim and/or failing to subject its investigation results to a cognitive evaluation or review.  Doc. 1-1at 4-6.  Extraordinary cases of bad faith are limited to instances where the plaintiff produces *substantial evidence* that the insurer intentionally or recklessly failed to investigate the claim, subject it to a proper cognitive evaluation or review, created a debatable reason to deny the claim, or relied on an ambiguous portion of the policy to deny the claim.  *See Brown*, 832 So. 2d at 16 (emphasis added).  To prove that an insurer denied a claim in "extraordinary" bad faith, a plaintiff must establish, "(1) that the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review and (2) that insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim."  *Id.*

Here, Defendant contends that Plaintiffs cannot establish a *prima facie* case for "extraordinary" bad faith because it conducted a thorough investigation and subjected the results of its investigation to a cognitive review.  Doc. 25 at 20-22.  Plaintiffs disagree.  The court turns now to the parties' respective contentions about the investigation and the subsequent cognitive review.

18

*1.     Defendant's investigation*

Again, Plaintiffs attack Defendant's investigation, in part, by asserting that Defendant failed to conduct an electrical investigation.  Doc. 28 at 20-21.  This assertion, however, lacks merit.  As discussed in section A, *supra*, Defendant submitted Bishop's certified electrical engineering report, which ruled out an electrical cause, proof of payment to Bishop's company, UI&S, for an electrical investigation, and an affidavit from SO&C investigator, Evers, who reviewed Bishop's findings.  Plaintiffs failed to rebut these evidentiary materials and offered no evidence challenging Defendant's electrical examination, other than their erroneous contention that Defendant failed to conduct one.  Thus, because Defendant, in fact, conducted an electrical evaluation, the results of which eliminated the occurrence of an electrical fire, Plaintiffs' contention misses the mark.

Plaintiffs assert also that Defendant failed to marshal the expert reports Plaintiffs obtained.  Doc. 28 at 21.  This contention lacks merit also because the validity of an insurer's denial of a claim is judged by the information the insurer had at the time it made the decision.  *See Dutton*, 419 So. 2d at 1362.  Here, Plaintiffs' experts began their investigation on March 12, 2010, and reported their

findings on April 14, 2011, and April 15, 2011, (doc. 29-4 at 2, 23), all of which occurred well *after* Defendant rejected Plaintiffs' claim on February 3, 2010.

Needless to say, Plaintiffs' expert findings are outside the relevant time frame.  As Plaintiffs acknowledge in their opposition brief, "[i]nformation received after the denial is irrelevant, no matter how valid."  Doc. 28 at 7.  Rather, as Plaintiffs point out, "[t]he decision to deny a claim must be judged by what was before the insurer at the time of the denial."  *Id*.  Here, long before Plaintiffs' experts began their investigations, Defendant conducted its own fire-scene and electrical investigations that ruled out accidental, electrical, and other non-incendiary causes of the fire.  Defendant also conducted several interviews, and assessed Plaintiffs' business and personal financial information.  Thus, contrary to Plaintiffs' contentions, Defendant, in fact, marshaled the facts then available to it before it denied Plaintiffs' claim.

2.    *Cognitive Review*

Plaintiffs assert next that Defendant failed to conduct a proper cognitive review because:  (1) Defendant's claim supervisor, Underwood, failed to undertake his own assessment and relied instead on the findings of the SO&C report, and (2) utilized an electronic review rather than an in-person review.  Doc. 28 at 9, 18-26.  To support their contentions, Plaintiffs cite to a few passages from Underwood's

deposition.  First, when asked if he evaluated the information apart from his expert's findings, Underwood stated, "Well, I consider everything; but I also give the most weight to our expert. He is the expert."  Doc. 27-25 at 58 (dep. p. 57). Next, as to why he failed to inquire about the existence of legitimate reasons for the presence of flammable mineral spirits, he responded, "Because the information we had, I felt, was conclusive."  Doc. 27-25 at 59 (dep. p. 58).

Plaintiffs' contentions, however, again miss the mark because an insurer may rely on information provided by an outside source.  *See Singleton v. State Farm Fire & Cas. Co.*, 928 So. 2d 280, 286 (Ala. 2005) (reasonable minds can infer that an adjuster's consultation with an outside source can be used as evidence that a cognitive evaluation took place prior to the denial of a claim).  Moreover, Plaintiffs offer no evidence to show why the reliance here was unreasonable.  In fact, Defendant's reliance on expert reports shows that it acted reasonably and considered multiple information sources before denying Plaintiffs' claim. Furthermore, Underwood made it clear that he considered "everything" and not just the experts' reports in evaluating the claim.  Doc. 27-25 at 58 (dep. p. 57).  In short, Plaintiffs' contention that Defendant failed to conduct a proper cognitive review because Underwood relied solely on the experts' reports in denying the

claim is contrary to the evidence here and the law, which permits an insurer to rely on an outside source in its evaluation of a claim.  *See Singleton*, 928 So. 2d at 286.

As to Plaintiffs' contention that Underwood's electronic review constituted an improper cognitive review, the court ties it in with their final contention that Defendant's "round table"[13] also constituted an improper cognitive review. Doc. 28 at 9,  22-25.  Basically, Plaintiffs contend that Defendant utilized a flawed cognitive review because the "round table" members reviewed individually documents they received by email rather than meeting collectively as a group. When asked about the "round table," Underwood stated that an unwritten company policy requires at least two additional colleagues to unanimously sign-off on a claim denial and that a single dissent would result in a reversal of the decision to deny.  Doc. 27-25 at 27-28, 32 (dep. p. 26-27, 31).  Consistent with that practice, Underwood asked two colleagues, by email, to electronically review the claim and ascertain whether he made the right decision to deny it.  *Id.* at 27-28 (dep. p. 26-27).  Plaintiffs argue that Underwood cannot confirm that his two colleagues fully reviewed the claim since their review occurred outside his presence, doc. 28 at 26, and that for that reason also Defendant conducted a flawed cognitive review.

---

[13] Defendant's "round table" is a claim review process involving two or more employees who review the claim to make sure that the right decision is made.  Doc. 27-25 at 28 (dep. p. 27).

22

Underwood's testimony, however, was confirmed by another member of the "round table" Plaintiffs deposed.  Specifically, in his deposition, Plaintiffs asked John Block ("Block"), "Q. Was anyone else asked to review the file independently without collaboration?  A. Yes.  Q. Was that Diane Weaver?[14]  A. Yes."  Doc. 29-1 at 35.  Further, Block was asked, "Q. And did you have an obligation to review the complete file from start to finish, at least to the point it existed when you did your independent review?  A. I was asked to review the file, and I did review the file."  Doc. 29-1 at 40.  In other words, consistent with Underwood's testimony and Defendant's policy, Defendant denied Plaintiffs' claim after receiving unanimous agreement from Underwood, Block, and Weaver.  Doc. 27-25 at 26, 32 (dep. p. 25, 31).

While Plaintiffs contend that Defendant conducted a purportedly flawed electronic "round table" review, they offer no evidence to show that either an in-person review is required or that an electronic review is insufficient.  Moreover, Plaintiffs' contention that an electronic review cannot constitute a proper cognitive review ignores the reality of the modern world where individuals and businesses transmit and review documents electronically and conduct virtual online meetings.  In fact, electronic reviews or other methods utilizing email or the internet may now

---

[14] Plaintiffs offered no evidence to refute Defendant's contention that Weaver also reviewed the file and signed off on Underwood's decision to deny the claim.

be the norm since they offer efficiencies and cost savings over physical meetings or hard copy document deliveries.  In any event, Plaintiffs' contentions that a review is flawed if it is electronic and that "[t]he claim process shows a reckless indifference to facts presented, and failure to thoughtfully employ a 'cognitive evaluation' of other potential causes than arson," (doc. 28 at 29), is unfounded and has no support in the case law.  There is simply no evidence here that the electronic "round table" resulted in a failure to adequately review Plaintiffs' claim by virtue of the members conducting separate reviews. Again, if any member of the round table had disagreed with Underwood, Defendant's policies would have dictated that Defendant pay the claim.  Doc. 25-25 at 32 (dep. p. 31).  Thus, the round table members are separately empowered and do not need to meet physically to exercise their individual power.  To suggest that an electronic review is automatically a flawed cognitive review is, at best, rank conjecture which is insufficient to defeat summary judgment.  *See Roberts v. NASCO Equip. Co. Inc.*, 986 So. 2d 379, 385 (Ala. 2007) (citing *Hurst v. Ala. Power Co.*, 675 So. 2d 397, 400 (Ala. 1996)).

In the final analysis, the evidence here shows a difference in opinion as to Defendant's review process, rather than Defendant's failure to submit the claim to a cognitive review.  Where, as here, Plaintiffs failed to produce substantial

24

evidence showing that Defendant intentionally or recklessly failed to investigate their claim or failed to properly subject the claim to a cognitive evaluation or review, summary judgment is warranted also on the extraordinary bad faith claim.

## IV.  CONCLUSION

Plaintiffs have failed to establish a *prima facie case* of ordinary and extraordinary bad faith.  Defendant proffered three "arguable" reasons for denying Plaintiffs' claim, none of which Plaintiffs rebutted.  Also, Plaintiffs failed to produce substantial evidence proving that Defendant failed to properly investigate their claim or submit the results of its investigation to a cognitive evaluation and review.  Consequently, the court finds that there are no genuine issues of material fact as to the ordinary and extraordinary bad faith claims.  For these reasons, Defendant's motion for summary judgment on bad faith is **GRANTED**.  The motion is **GRANTED** also on the fraud, deceit, and  misrepresentation claims since Plaintiffs concede these claims.  *See* Doc. 28 at 30.

This case is set for a pre-trial conference in the chambers of the undersigned in **Birmingham, Alabama** on **August 23 , 2011**, beginning at **9:00 a.m.,** and for **trial in Florence, Alabama, on October 31 , 2011, beginning at 9:00 a.m.**   The attention of counsel is directed to the attached PRE-TRIAL CONFERENCE

instructions, which require that counsel submit a proposed Pre-Trial Order at least four business days in advance of their conference.

Done the 25th of July, 2011.

_____

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA

## PRE-TRIAL DOCKET
## HON. ABDUL K. KALLON, PRESIDING

## BIRMINGHAM, ALABAMA

This case is  set for a pre-trial hearing pursuant to Rule 16 of the Federal Rules of Civil Procedure.  A conference-type hearing will be held in chambers in the Hugo Black Federal Courthouse in Birmingham, Alabama at the time indicated.

The hearing will address all matters provided in Rule 16, including the limitation of issues requiring trial, rulings on pleading motions, and settlement possibilities.

Counsel attending the conference are expected to be well-informed about the factual and legal issues of the case, and to have authority to enter appropriate stipulations and participate in settlement discussions.  Counsel appearing at the conference will be required to proceed at trial notwithstanding the naming of others as designated trial counsel.

Promptly upon receipt of this notice, plaintiff's counsel is to initiate discussions with other counsel aimed at ascertaining which basic facts are not in dispute, at clarifying the parties' contentions (for example, just what is denied under a "general denial") and at negotiating  workable procedures and deadlines for remaining discovery matters.  At least four (4) business days in advance of the conference, plaintiff's counsel is to submit to chambers (via email at kallon_chambers@alnd.uscourts.gov)a proposed Pre-trial Order in WordPerfect format, furnishing other counsel with a copy.  It is anticipated that in most cases the proposed order, with only minor insertions and changes, could be adopted by the court and signed at the close of the hearing.

A sample of a proposed Pre-trial Order is available on the Chamber web site (www.alnd.uscourts.gov/Kallon/Kallonpage) to illustrate the format preferred by

27

the court and also to provide additional guidance and instructions.  Each order must, of course, be tailored to fit the circumstances of the individual case.

Counsel drafting this proposed order should consider the utility this document will provide for the litigants, the jury, and the court alike.  The court anticipates using the pretrial order to (1) identify and narrow the legal and factual issues remaining for trial, and (2) provide jurors with the legal and factual context of the dispute.  This order should **not** revisit at length arguments made in previous filings with the court, nor should it serve as another venue for adversarial posturing.  Pretrial orders should be simple, short, and informative.

IN ANY CASE WHERE COUNSEL HAVE ANNOUNCED SETTLEMENT TO THE COURT, A CONSENT JUDGMENT IN SATISFACTORY FORM MUST BE PRESENTED TO THE COURT  PRIOR TO THE SCHEDULED TRIAL DATE; OTHERWISE, THE CASE WILL BE DISMISSED WITH PREJUDICE.

28